UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,
Plaintiff,

Case No. 09-20295-05
HON. MARIANNE O. BATTANI

v

MARY WATERS,
Defendant.
_____/

Robert Cares                                    Richard G. Convertino
United States Attorney                          Attorney for Mary Waters
211 W. Fort Street, Ste. 2001                   801 West Ann Arbor Trail,
Detroit, MI 48226                               Plymouth, Michigan  48170
313-226-9100                                    (734) 927-9900

_____

DEFENDANT'S MOTION TO SUPPRESS WIRETAP EVIDENCE

NOW COMES, Defendant Mary Waters, who by and through Counsel, Richard G.

Convertino, respectfully submits this Motion and hereby moves this Honorable Court, pursuant

to Title 18, United States Code, Sections 2515 and 2518(10)(a), to suppress all wiretap evidence,

including recordings and all evidence derived therefrom,  in this case.

As grounds for this motion, Ms. Waters represents as follows:

1.   On June 13, 2007, the government obtained authorization for a wiretap on the

telephone of co-defendant Samuel L. Riddle, Jr.  The government sought and

obtained six extensions of that wiretap.[1]

---

[1] Although the application and order signed on December 11, 2007, refer to the application as a Sixth Renewal
Application and Order for Sixth Reauthorization, in fact the December 11, 2007 application and order were for a
new interception of Target No. 810-877-0517, in that the Fifth Extension of the Wiretap expired on December 9,
2007.  Amended Order Dated 12/07/2007, at 3, par. 10.  The Wiretap had thus become inactive on December 10-11,
2007.  The Order for Sixth Reauthorization specifically creates a new effective date rather than extending the

2.   Defendant Mary Waters, though intercepted on more than 1,000 telephone calls during the existence of the wiretap, was never a named interceptee in any of the seven affidavits.[2]

3.   On May 6, 2010, pursuant to a specific request from Ms. Waters, the government provided an order dated December 7, 2007, signed by the Honorable Avern Cohn, U.S. District Judge, entitled "Amended Orders Reauthorizing the Interception of Wire Communications."  (Attachment A).

4.   In response to counsel's specific request on May 6, 2010, the government asserted that it had provided the December 7, 2007, Order signed by the Honorable Avern Cohn, U.S. District Judge, entitled "Amended Orders Reauthorizing the Interception of Wire Communications." order "on 9/4/09," *which in fact the government had not*. Prior to May 7, 2010, neither Ms. Waters nor her counsel had seen the December 7, 2007 Amended Order.

5.   <u>The December 7, 2007 Amended Order makes clear that the government miscalculated the 30-day period in both September and October 2007</u>.  By the Court's reasoning and recalculation, the 30th day of the September 13, 2007, Third Renewal Order was October 12, 2007.  While the government sought and obtained a Fourth Renewal Order on October 13, 2007, <u>by its very terms, that Fourth Renewal Order</u>

_____

previous wiretap.  By operation of Judge Cohn's 12/07/2007 Amended Order, all tapes from September 13, 2007 (Call Nos. 8686 through 8799), October 13, 2007 (Call Nos. 11130 through 11166), and December 10, 2007 should have been sealed in that they were the product of unauthorized wiretaps.

[2] Failure to identify interceptees the government has linked to criminal activity may require suppression of wiretap evidence, particularly where the government's deceptive behavior was calculated to mislead the judge regarding the necessity for a wiretap.  *United States v. Ailemen*, 986 F. Supp. 1228 (N.D. Cal. 1997).

did not take effect until October 14, 2007.  <u>Thus, no calls intercepted on October 13, 2007, are admissible, for there was no valid wiretap order in effect on that day</u>.  Judge Cohn specifically made that finding.  Amended Order dated December 7, 2007, at 3.

6.  Judge Cohn's Amended Order dated December 7, 2007, notwithstanding, the government marked as a trial exhibit, Government's Exhibit 2(Q) (Call No. 11152), an intercepted call on October 13, 2007 between co-defendant Samuel L. Riddle Jr. and William Lattimore.

7.  By the terms of Judge Cohn's Amended Order, <u>Call No 11152 was illegally intercepted</u> and is inadmissible.  18 U.S.C. §§ 2515, 2518(10)(a)(i).

8.   Judge Cohn's amended order dated December 7, 2007, specifically stated that:

> The amendments in the effective dates of the various orders clarifies that interceptions occurred without Court authorization only on September 13, 2007, and October 13, 2007.  The Court notes that no interception from either of those days was ever used in any of the subsequent affidavits presented to the Court. This fact also bolsters the Court's conclusion that the government's errors were made in good faith.

> Amended Order Dated December 7, 2007, at 3.

9.  Pursuant to Title 18, United States Code, Sections 2515;

> Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, … if the disclosure of that information would be in violation of this chapter.

10.  Given the fact that Judge Cohn's Amended Order dated December 7, 2007 specifically credited the government for not theretofore using tapes of illegally intercepted on October 13, 2007, it can hardly be gainsaid that the government continued to act in good faith here by continuing to use Tape 11152 through the

3

investigative process, interviews with Ms. Waters, presentation to the Grand Jury, and
ultimately marking the illegal interception as a public exhibit to be entered at trial.

11. The government here not only intercepted the October 13, 2007 telephone call
(Government's Exhibit 2(Q) (Tape 11152)) in violation of any valid wiretap, as
reflected by Judge Cohn's Amended Order; <u>the government relied on that illegally
intercepted Tape 11152 in its April 24, 2009 interview with Defendant Waters, and
the government also relied on the illegally intercepted Tape 11152 in obtaining the
July 15, 2009 First Superseding Indictment against Defendant Waters and Co-
Defendant Riddle</u>.  As such, the entire indictment and Grand Jury process was tainted.
18 U.S.C. §§ 2515, 2518(10)(a)(i).

12. Accordingly, not only must Government's Exhibit 2(Q) (Tape 11152) be suppressed;
the entire First Superseding Indictment must be dismissed.[3]  *United States v. Brodson*,
528 F.2d 214, 216 (7th Cir. 1975*); United States v. Carlberg*, 602 F. Supp. 583 (W.D.
Mich. 1984); *United States v. Aloi*, 449 F. Supp. 698, 721 (E.D.N.Y. 1977).

13. In that the government knowingly violated the provisions of Title III by failing to seal
Tape 11152, Ms. Waters respectfully requests that this Honorable Court suppress all
of the wiretap evidence and dismiss the First Superseding Indictment with prejudice.

14. Further, under 18 U.S.C. § 2518(1)(e), each application was required to set forth what
has occurred on all previous wiretaps.  The Sixth Renewal Application, dated
December 11, 2007, clearly did not comply with § 2518(1)(e).  SA Lubisco's
December 11, 2007 affidavit at Paragraphs 8 and 9 addressed the Fourth renewal

---

[3] In that Tape 11152 involved an interception of William Lattimore, who has already pleaded guilty, it appears the
government may have withheld evidence material to the guilt and punishment of Mr. Lattimore; no doubt had he
been provided with Judge Cohn's amended order (which Defendant Waters only received on May 6, 2010, pursuant
to a specific request), Mr. Lattimore would have similarly moved to dismiss the charges against him.  Under these
circumstances, the requirements of Title 18, United States Code, Section 2520(f) seem abundantly clear.

affidavit dated October 13, 2007, but SA Lubisco failed to mention what, if anything, happened with the Fifth renewal affidavit and application dated November 10, 2007. The Sixth Renewal Application, signed only by AUSA Jonathan Tukel, referred at Paragraph B to the Court's Order dated November 10, 2007 and the "amended order" dated December 7, 2007, but the application did not provide any explanation why there was a December 7, 2007 amended order. Within the four corners of Lubisco's December 10, 2007 affidavit, it would at a minimum appear that the government was relying two-month old evidence to justify continuing the wiretap. The Sixth Renewal application offered no insight into why the Court issued and amended order on December 7, 2007. As set forth above, the government's deliberate usage of Call No. 11152, in violation of Judge Cohn's December 7, 2007 amended order, tainted the entire wiretap and, as such, all of the wiretap evidence herein should be suppressed.

15. Turning to the initial application, on June 13, 2007, the government obtained authorization for a wiretap on the telephone of co-defendant Samuel L. Riddle, Jr.[4] The initial authorization was based on the affidavit of FBI Special Agent Michael Lubisco, and the court authorized interception of Samuel L. Riddle, Jr. and Wendolyn Johnson (an employee of the United States Attorney's Office), and authorized

---

[4] The government provided, on May 6, 2010, an order dated December 7, 2007, signed by the Honorable Avern Cohn, U.S. District Judge, and entitled "Amended Orders Reauthorizing the Interception of Wire Communications." Defendant Mary Waters had specifically requested that the government provide the order, previously undisclosed in discovery, a copy of the "Title III Amended Order dated December 7, 2007, along with any accompanying affidavit(s) , application(s), and documentation explaining why an amended order was issued." In response, the government asserted that it had provided the December 7, 2007 Amended Order "on 9/4/09," which in fact the government had not. The government has not provided any supporting documentation for how Judge Cohn's December 7, 2007 Amended Order came to be issued in the first place. It is clear from the contents of the order, however, that the government repeatedly miscalculated its 30 day periods of interception beginning on or about September 12, 2007. The December 7, 2007 Amended Order mistakenly identifies the initial authorization date at June 11, 2007; the actual initial authorization date was June 13, 2007.

interception for violations of Title 18, United States Code, Section 1503 only.[5]  Much of the information supporting SA Lubisco's initial affidavit was already considerably stale.

16. Initially, Defendant Waters moves to suppress the original application and wiretap dated June 13, 2007, for failure to establish probable cause.  SA Lubisco's June 13, 2007 affidavit made repeated reference to an Unwitting Source (e.g. Lubisco's June 13, 2007 affidavit, Paragraphs 11, 12, 17, 18, 23, and 24).  Defendant Waters was the "Unwitting Source," and the government so conceded in Government's Motion for Hearing Regarding Possible Conflicts of Interest, at 16, 18, and 27.

17. As the Unwitting Source, Ms. Waters spoke casually with Paul Bruno, a senior official at the Wayne County Prosecutor's Office, at a dinner party in June 2006. Bruno is identified in Lubisco's September 13, 2007 affidavit as "Source-1".  SA Lubisco averred that Bruno was not willing to testify, and that most of Bruno's information came from Ms. Waters.  Although Ms. Waters spoke with Bruno in June 2006, and SA Lubisco did not seek a wiretap until a year later, on June 13, 2007.  The FBI never approached Ms. Waters prior to or during the wiretap; rather, SA Lubisco relied on information that was already one year stale.  Bruno's 2006 information as well indicated that there was romantic involvement between Riddle and Johnson, a relationship that accounted for many of the telephone calls between them.

18. Despite never seeking the court's permission to intercept Ms. Waters, and despite never even accusing Ms. Waters of illegal activity, SA Lubisco intercepted and recorded more than 181 pages of synopsized calls, translating to roughly 1,800 calls.

---

[5] The charged offenses here, bribery under 18 U.S.C. § 666, are not enumerated offenses for which a wiretap may be authorized.  18 U.S.C. § 2516(1).

Never once did SA Lubisco alert the Court that Mary Waters was the Unwitting Source; nor did SA Lubisco notify the Court that its Unwitting Source, whom Bruno attempted to have speak with the FBI on June 21, 2006, was being constantly monitored and recorded, and not for any violations of Title 18, United States Code, Section 1503.

19. At paragraph 33 of his June 13, 2007 affidavit, SA Lubisco referred to telephone toll analysis reflecting more than 1,000 calls between Riddle and Johnson between September 2005 and April 2007.  Defendant Waters has requested the pen register information from the government, but to date, none has been provided.  Even though the FBI recorded more than 1,000 calls between Riddle and Johnson, very few had any discussion about pending cases.

20. Moreover, the government never established nor answered the most basic question of necessity under 18 U.S.C. § 2518(1)(c), i.e., why the government did not seek and had not sought a wiretap of Wendolyn Johnson. After all, Johnson was the only named conspirator who violated Federal Rule of Criminal Procedure 6(e), and without her, there could be no § 1503 obstruction of justice based on improper disclosure of Grand Jury information.  Rather, the government bypassed the most obvious basic step in the investigation, and that was to seek a wiretap of Johnson's telephone(s) to establish that telephones were even being used to obstruct justice. Then, had the FBI intercepted Johnson passing Rule 6(e) material to Riddle, the FBI might have had a more colorable claim to seek a wiretap on Riddle.  The government's boilerplate recitation of difficulties in obtaining usable evidence through non-wiretap means was insufficient to establish necessity.  *United States v.*

*Landmesser*, 553 F.2d 17, 19-20 (6th Cir. 1977); *United States v. Leavis*, 853 F.2d
215, 221 (4th Cir. 1988); *United States v. Kerrigan*, 514 F.2d 35, 38 (9th Cir. 1975);
*United States v. Velazquez-Feliciano*, 107 F. Supp.2d 134, 137 (D. P.R. 2000)
(application should establish that the government has unsuccessfully employed less
intrusive means of investigation and that the wiretap "'seems a suitable next step in a
plausible progression.'").[6]

21. SA Lubisco's initial June 13, 2007 affidavit misrepresented a crucial date at
paragraph 18.  SA Lubisco referred to USAO strategy sessions in January 2006, but
then SA Lubisco misled the Court by referring to a January 2006 memo as dated
"January 30, *2007*."  There is a significant difference between information that is five
months old and information that is a year and five months stale.

22. At Paragraph 30 of his June 13, 2007 affidavit, SA Lubisco never disclosed that
Source-3 was in fact Genessee County Drain Commissioner Jeff Wright.  However,
in his March 16, 2010 motion regarding potential conflicts of counsel, AUSA Robert
Cares referred to the Genesee County Drain Commissioner without disclosing that
Drain Commissioner Wright was also Source-3 here.

23. At Paragraph 32 of his June 13, 2007 affidavit, SA Lubisco claimed that Riddle told
Source-3 (Jeff Wright) that Riddle had checked with the highest level in Detroit.  SA
Lubisco, however, failed to conduct any further investigation and made no

---

[6] Upon information and belief, Defendant Waters believes that the government had Wendolyn Johnson place
consensually monitored telephone calls, in the present of an FBI Special Agent and an Assistant United States
Attorney (AUSA), from the United States Attorney's Office (USAO) to co-defendant Riddle.  If so, these
government-initiated calls to Riddle were not disclosed to the Court in connection with the wiretap applications and
were not disclosed to Defendant Waters.

representations whatsoever whether Wendolyn Johnson had ever accessed a computer regarding the fictitious person in Paragraph 32.

24. The initial wiretap was based upon a purported authorization, dated June 8, 2007, by Deputy Attorney General John C. Keeney, who claimed his authority based upon a delegation from Attorney General Alberto Gonzales, Attorney General Order 2758-2005.[7]

25. The initial wiretap became operational on June 15, 2007.   The 30th day of the initial authorization was July 14, 2007.

26. On July 3, 2007, then-Attorney General Alberto Gonzales purportedly issued Attorney General Order 2887-2007, which ostensibly created a new Attorney General authorization effective that day.  By the operation of its own terms, if Attorney General Order 2887-2007 was a valid exercise of the Attorney General's power, then prior Attorney General Order 2758-2005 was revoked effective July 4, 2007.[8]

27. Even though Attorney General Order 2758-2005 had been revoked on July 4, 2007, the government continued to rely on Attorney General Order 2758-2005 in making applications for wiretap renewal extensions on: July 14, 2007; August 13, 2007;

---

[7] Title 18, United States Code, Section 2516(1) requires that a wiretap application be authorized by the Attorney General or, *inter alia*, any Deputy Assistant Attorney General or acting Deputy Assistant Attorney General in the Criminal Division specially designated by the Attorney General.

[8] At the time Attorney General Gonzales issued A.G. Order 2887-2007 on July 3, 2007, the Department of Justice was in considerable turmoil over the firings of the nine U.S. Attorneys and the increased politicization of the Department of Justice.  Kyle Sampson, the Attorney General's Chief of Staff, had resigned in March 2007.  Monica Goodling, Senior Counsel to the Attorney General had resigned in May 2007.  William Mercer, the Acting Associate Attorney General, had withdrawn from a nomination for Associate Attorney General in June 1007.  Deputy Attorney General Paul McNulty had resigned on May 14, 2007, after testifying before the Senate Judiciary Committee.  Attorney General Gonzales, in announcing the appointment of an Acting Deputy Attorney General on July 20, 2007, appeared on the Justice Television Network and assured the entire DOJ that there was no room for politics in the Department of Justice and that he would not resign despite public pressure.  Six weeks later, Gonzales resigned on August 27, 2007.  An Investigation into the Removal of Nine U.S. Attorneys in 2006, DOJ Office of Inspector General/DOJ Office of Professional Responsibility (September 2008), at 10-13.

September 13, 2007; and October 13, 2007.  It was not until the November 10, 2007

application for wiretap renewal extension that the government even mentioned the

active delegation order, Attorney General Order 2887-2007, in making application.[9]

28. The Attorney General's delegation powers are narrowly defined.  *United States v.
Giordano*, 416 U.S. 505 (1974); *United States v. Robinson*, 468 F.2d 189, 191-92 (5th
Cir. 1972).  As the Supreme Court held, "These procedures were not to be routinely
employed as the initial step in criminal investigation."  *Giordano*, 416 U.S. at 515.

29. The court in *Robinson* held, examining the legislative history of Title III:

> By expressing its intention that only a "publicly responsible official
> subject to the political process" could initiate a wiretap application, Congress
> wanted to make certain that every such matter would have the *personal* attention
> of an individual appointed by the President and confirmed by the Senate.
> [footnote omitted.]  Its reasoning was that this narrow limitation to top department
> officials would (1) establish a unitary policy in the use of the awesome power
> conferred, and (2) require that power to be exercised with a circumspection
> reenforced [*sic*] by ready identifiability of he who was responsible for its use, thus
> maximizing the guarantee that abuses would not occur.
> …
>
> The citizen's right to be left alone demands that the spirit require strict
> compliance with the letter of this legislative proviso.

*Robinson*, 468 F.2d at 192-93.  Here, at the time of the September and October

extension applications, the Department of Justice had no Senate-confirmed Attorney

General and no Senate-confirmed Deputy Attorney General.  The Acting Attorney

General, Peter Keisler, was the Assistant Attorney General in charge of the Civil

Division, which has no authority to obtain or seek wiretaps.  In that there was no valid

Attorney General who had been vetted by the political process, the wiretap applications

---

[9] *A fortiori*, if the July, August, September, and October extensions were invalid, then by definition, the November
and December extension applications and orders are also invalid.  *United States v. Giordano*, 416 U.S. 505, 531-32
(1974); 18 U.S.C. §§ 2515, 2518(10)(a).

for September 13, 2007, and October 13, 2007, cannot be said to have been properly

approved by the Attorney General or an authorized designee. [10]

30. In his July 14, 2007 affidavit seeking a renewal of the wiretap, SA Lubisco at

Paragraph 4 swore that

> On June 22, 2007 (call 853), the individual identified in the Original
> Affidavit as Source-3, acting at the direction of FBI agents, called SAMUEL
> RIDDLE.  Source-3 recorded the call, which was also intercepted without the
> knowledge of Source-3, who is unaware of the Original Order.  Source-3 asked
> SAMUEL RIDDLE to check out a person named Glen Blanton, who is
> advertising himself as a consultant.  See Original Affidavit Par. 21.  Your affiant
> is aware that Glen Blanton, who is cooperating with the FBI, in fact holds himself
> out to the public as a consultant.  Although Source-3 does not know anyone who
> in fact has been in contact with Glen Blanton, but rather has been told by FBI
> agents to state that fact, Source-3 was told to make that statement to protect
> himself and Blanton, and to ensure the integrity of the Original Order and the
> instant investigation.

There was in fact no recorded Call No. 853.  In the recorded calls provided Ms.

Waters, Call 852 was recorded at 5:28 p.m. on June 22, 2007, a call Riddle made to

313-629-2679.  Call 854 was recorded at 5:47 p.m. on June 22, 2007, a call Riddle

made to 313-778-2199.  The FBI synopsis for "Call 853" reflects only "pen," for "pen

register."  There is no recorded Call 853.

31. Moreover, not only did the FBI not record a Call 853; Riddle's telephone records

reflect no incoming or outgoing calls between the 5:19 p.m. call on June 22, 2007, to

313-628-2679 and the 5:38 p.m. call on June 22, 2007, to 313-778-2199.[11]  Even if

SA Lubisco made a typographical error on the Call Number, such that Call 853 exists

---

[10] Again, if either the September or October applications were invalid, then by definition the November 10, 2007 and December 11, 2007 applications were also invalid as derived from an unauthorized wiretap.  *United States v. Giordano*, 416 U.S. 505, 531-32 (1974); 18 U.S.C. §§ 2515, 2518(10)(a).

[11] For the first month of the wiretap, the FBI starting clock ran 9 minutes ahead of the AT&T clock tracking Riddle's phone calls.  Both by the AT&T records and the FBI log, there simply was no Call 853 on Riddle's phone, and certainly not on June 22, 2007.  Nor has the purported tape made by S-3, Jeff Wright, been provided to Defendant Waters.

under some other identifier within the 20,000-plus calls, by the FBI's own synopsis, Riddle and Johnson had two actual phone calls on June 22 (Call Nos. 775, 788), five actual phone calls on June 23 (Call Nos. 883, 939, 943, 956, 969), and three actual phone calls on June 25 (Call Nos. 1079, 1089, 1154), and none of those calls discussed "Glen Blanton."

32. To the extent SA Lubisco claimed in his July 14, 2007 affidavit that Calls 1210 and 1212 demonstrated that Wendolyn Johnson was leaking information to Riddle, Call 1210 reflects that Johnson remained silent when asked about Blanton.  Likewise, in Call 2922, Johnson remained silent when asked about Sherry Washington.  In the entire first month of the wiretap, SA Lubisco cited only three calls between Riddle and Johnson that reportedly pertained to obstruction of justice.  In two of those calls, 1210 and 2922, Johnson remained silent.  In the third call, Call No. 1212, Riddle and Johnson made lunch plans, and all Johnson said was "umm-hmm" when Riddle asked whether he should avoid Blanton.  SA Lubisco's July 14, 2007 affidavit failed to establish probable cause to continue the wiretap.  The July 14, 2007 wiretap order was thus invalid, and all recordings made thereunder and thereafter should be suppressed.[12]

33. The July 14, 2007 affidavit contained a typewritten date of July 13, 2007.  Through the typewritten 13 is a handwritten "14."  Neither SA Lubisco nor Judge Cohn initialed this pen change to the affidavit date.

---

[12] SA Lubisco's conclusion in Paragraph 19 of the July 14, 2007 affidavit that Riddle had not identified his source to Source-3, and so Lubisco needed another 30 days of wiretaps to "confirm" that Johnson disclosed Blanton to Riddle was disingenuous.  Blanton was not even an active Grand Jury investigation, according to Lubisco.  And Lubisco's initial affidavit and July 14, 2007 renewal affidavit named only Wendy Johnson as the possible leak within the USAO. By the very recordings of Johnson on Tapes 1210 and 1212, there was no probable cause that Johnson had leaked anything, and a 30-day extension was not based upon probable cause.

34. The 8/13/2007 application for a second extension bears a typewritten date of August 14, 2007, and a handwritten date of August 13, 2007.  Neither AUSA Jonathan Tukel nor the Honorable David M. Lawson corrected this typewritten date.

35. SA Lubisco's August 13, 2007 affidavit contains no paragraph 22.  The August 13, 2007 affidavit proceeds directly from paragraph 21 to paragraph 23.

36. The government repeatedly made the same misrepresentation to the Court regarding Call 7454, which SA Lubisco referred to as an "unknown male."  Call 7454 contained only a partial sentence, but SA Lubisco on four separate occasions averred that the partial sentence demonstrated that Riddle was disclosing Grand Jury information.[13] To the contrary, Riddle was providing information he had received directly from Sherry Washington, and information Riddle had relayed to the federal investigators through Wendy Johnson.[14]

37. What is more troubling, however, is that the FBI knew, from April 23, 2007 forward, who the "unknown male" was that Riddle called in Call 7454.  The FBI knew, from pen register information, phone records, and the wiretap itself that the "unknown male" in Call 7454 was Bankole Thompson, Senior Editor of the Michigan Chronicle and a prominent figure in Detroit radio, television, and print media.  Yet, in eight months time, the FBI never disclosed to the Court that they were intercepting a clearly identifiable news reporter, and they repeatedly failed to minimize telephone calls that clearly implicated the First Amendment.

---

[13] Lubisco 9/13/2007 affidavit, par. 20; Lubisco 10/13/2007 affidavit, par. 20; Lubisco 11/10/2007 affidavit, par. 20; Lubisco 12/11/2007 affidavit, par. 17.

[14] Indeed, providing previously unknown information to federal investigators would seem to be the exact opposite of obstructing justice.

38. SA Lubisco failed to disclose to the Court that the very next call on August 30, 2007,

Call 7455, was a return call to Riddle from Bankole Thompson, and Thompson told

Riddle that he had been on Al Sharpton's national radio show that very day.

Thompson was promoting his book, *A Matter of Black Transformation*, which had

just come out.  Thompson told Riddle that he had discussed the Detroit Public

Schools and Sherry Washington on Sharpton's radio show that day.  Two calls later,

Call 7457, Bankole Thompson called Riddle and discussed Sherry Washington, and

the fact that Washington had called Thompson an "African monkey" in public.

Riddle and Bankole Thompson spoke for more than three minutes and did not discuss

any Grand Jury information.  At most, Riddle and Thompson discussed the fact that

Washington was looking for someone to defend her.

39. What is telling about the FBI "obstruction" investigation here is that SA Lubisco

clearly knew that Riddle was calling a Senior Editor of the Michigan Chronicle to

discuss Sherry Washington, and yet the FBI never disclosed that Riddle was calling a

known member of the press.  The DOJ regulations for issuing subpoenas to members

of the media are crystal clear.  DOJ and the FBI cannot even issue a subpoena for *toll

records* of a reporter unless DOJ has prior approval from the Attorney General.  28

C.F.R. § 50.10.  The United States Attorney's Manual also specifically provides:

> Government attorneys should ordinarily refrain from imposing upon members of
> the news media forms of compulsory process which might impair the news
> gathering function.  In all cases, members of the Department must balance the
> public's interest in the free dissemination of ideas and information with the
> public's interest in effective law enforcement and the and the fair administration
> of justice.  The policies, procedures and standards governing the issuance of
> subpoenas to members of the news media, subpoenas for the telephone toll
> records of members of the news media, and the interrogation, indictment, or arrest
> of members of the news media are set forth in 28 C.F.R. § 50.10.

The Attorney General's authorization is normally required before the issuance of any subpoena to a member of the news media or for the telephone toll records of a member of the news media.

United States Attorney's Manual, Section 9-13.400.  It stands to reason that, if the

Attorney General must approve the issuance of a subpoena for the *toll records* of

a reporter, then some similar degree of approval would be necessary before the

FBI and the United States Attorney's Office could repeatedly intercept and record

the reporter's telephone calls, especially when the FBI repeatedly used Bankole

Thompson's Call 7454 to seek and obtain wiretaps in four consecutive months.

Notably, in each of those months, SA Lubisco avoided any compliance with 28

C.F.R. § 50.10 by simply referring to Bankole Thompson as an "unknown male."

40. Standing alone, SA Lubisco's repeated, material misrepresentation that Bankole

Thompson was an "unknown male" perpetrated a fraud on the Court.  Call 7454 was

not the only intercepted or recorded call with Michigan Chronicle Senior Editor

Bankole Thompson, however.  SA Lubisco failed to disclose to the Court, on any of

the four affidavits, that the FBI had recorded Bankole Thompson and Samuel Riddle

discussing Sherry Washington, Stephen Hill, and the Detroit Public Schools

investigation two weeks earlier, on August 16, 2007 (Calls 6130 and 6143).  SA

Lubisco also failed to disclose to the Court that Thompson and Riddle had discussed

Stephen Hill in Calls 6130 and 6143 a full two weeks before the 8/30/2007 meeting

regarding Hill at the United States Attorney's Office.  Thus, Call 7454 was not made

to an unknown male; SA Lubisco well knew that it could not form obstruction of

justice when Riddle and Reporter Thompson had already discussed Hill two weeks

earlier.  The government offers no explanation why SA Lubisco never disclosed this information to the Court.

41. Nor can the government plead ignorance about Bankole Thompson's identity or status as a reporter, author, and member of both the radio and television media.  The FBI had regularly intercepted and recorded Riddle's calls with Thompson:

> Call 789 (6/22/2007); Call 4236 (7/26/2007); Call 4244 (7/26/2007); Call 8723 (9/13/2007); Call 8865 (9/14/2007); Call 9508 (9/23/2007); Call 9843 (9/25/2007); Call 11514 (10/19/2007); Call 11949 (10/22/2007); Call 12262 (10/24/2007); Call 12291 (10/24/2007); and Call 12791 (10/28/2007).

42. Lest there be any doubt, Riddle particularly referred to Thompson as a "journalist" in Call 11949, and Riddle mentioned that Thompson had authored two books while still in his twenties in Call 12262.

43. What is clear is that the FBI not only knew they were recording a member of multiple journalistic media.  What is even clearer is that the FBI knew that Riddle was not spreading Grand Jury information to Bankole Thompson. And what is unfathomable is that the FBI took one snippet from Call 7454, disingenuously called Thompson an "unknown male," and then four times sought wiretap extensions based on SA Lubisco's conclusion that Riddle was obstructing justice.  The September, October, November, and December Lubisco affidavits thus all contained material misrepresentations that demonstrate there was no probable cause to continue the wiretap.  The FBI never sought the Court's permission to repeatedly record a member of the media.  And what is further clear from this bevy of recorded media calls is that Riddle and Bankole Thompson never discussed Grand Jury information.  What they discussed regarding Sherry Washington was already in the public domain, had

16

already been published by Thompson, and had already been disclosed on national

radio.

44. Upon reviewing the actual affidavits, it is abundantly clear that neither the affiant, the

reviewing officials at the Department of Justice, nor the Assistant United States

Attorneys making the applications carefully reviewed the affidavits.  What might be

dismissed as an occasional typographical error translates into gross negligence when

the same typographical errors appear month after month in successive renewal

applications.  For instance, in the October 13, 2007 affidavit for the Fourth Renewal

Application, SA Lubisco makes reference in Paragraph 24 to a phone call on

September 22, *2008* (Call 9466) to an unknown female regarding Sherry Washington.

Obviously, September 22, 2008 had not yet occurred as of October 13, 2007.  The

next month, however, the same multi-level review process in both the Eastern District

of Michigan and at the Assistant Attorney General Level failed to note the

discrepancy, for SA Lubisco again swore on November 10, 2007, again in Paragraph

24, that Call 9466 took place on September 22, *2008*.  The following month, SA

Lubisco repeated the nonexistent September 22, *2008* date in his December 11, 2007

affidavit, this time in Paragraph 21.  In addition, SA Lubisco in three consecutive

affidavits represented that the interceptee in Call 9466 was an "unknown female."

The phone number dialed in Call 9466 was publicly listed, the telephone number is

replayed on an answering machine in the call, and the person registered to the phone

number was a prominent television personality and political activist.  To represent

this public figure as an "unknown female" demonstrates the lack of due diligence and the lack of proper scrutiny with which SA Lubisco's affidavits were reviewed.[15]

45. In the December 11, 2007 affidavit in support of the Sixth Renewal Application, SA Lubisco mentions Call 16178, a telephone call between co-defendant Riddle and the uncharged Wendolyn Johnson on November 21, 2007.  SA Lubisco contended that Riddle and Johnson discussed Kevin Adell, who was the subject of a sealed indictment in an ongoing federal investigation.  SA Lubisco failed to disclose to Judge Cohn that Riddle only mentioned Kevin Adell in relation to the fact that "the feds" were "not doing shit" on Kevin Adell, and that Riddle hoped Adell would soon be charged so that the community would stop trying to defend Adell.

46. Even more inexplicable is SA Lubisco's complete failure to disclose to Judge Cohn that the FBI had interviewed co-defendant Riddle regarding Kevin Adell in approximately June 2006.  It was in that context that Defendant Waters first spoke with Paul Bruno regarding co-defendant Riddle, and thus became the "Unwitting Source" for SA Lubisco's initial wiretap application.  Ms. Waters told Paul Bruno that the FBI had interviewed co-defendant Riddle, and the interview was in regard to Kevin Adell.  SA Lubisco failed to disclose this information in any of his wiretap affidavits here, but it was even more egregious in that Lubisco's reference to the November 21, 2007 Call 16178 between Riddle and Wendolyn Johnson was the only

---

[15] Likewise, in the November 10, 2007 affidavit at Paragraph 80, SA Lubisco refers to "Call No. 132110," when in fact the call was Call No. 13210.  The following month, despite multi-levels of review, SA Lubisco again referred to "Call 132110" in Paragraph 77 of the December 11, 2007 affidavit.  Similarly, SA Lubisco spelled Stephen Hill's name "Stephen" in Paragraph 18 and "Steven" in Paragraph 19 of the September 13, 2007 affidavit.  SA Lubisco repeated that same "Stephen/Steven" misspelling in three subsequent affidavits: 10/13/2007 (Paragraphs 18, 19); 11/10/2007 (Paragraphs 18, 19); 12/11/2007 (Paragraphs 15, 16).  While the occasional misspelling might otherwise be insignificant, what it demonstrates here is that SA Lubisco continued to cut and paste stale information from one affidavit to the next, and none of the cadre of DOJ reviewers ever caught the repetitious mistakes.  It also strongly suggests that these affidavits were not being reviewed with any marked degree of caution.

call in the entire previous month that Lubisco cited for continuing the § 1503 wiretap on Riddle's phone.  SA Lubisco never disclosed to the Court that it was the FBI that provided co-defendant Riddle's knowledge that Kevin Adell was under investigation, not Ms. Johnson.

47. To compound the misdirection, the government has refused to produce the FBI report addressing its interview with co-defendant Riddle regarding Kevin Adell in approximately June 2006.  After representing in the December 11, 2007 affidavit and application that Riddle's November 21, 2007 discussion of Adell was probable cause to continue a wiretap on Riddle's phone, the government refused Defendant Waters' specific request to produce any information about the FBI interview of Riddle regarding Adell.  AUSA Cares' response to Ms. Waters was terse: "Not relevant." The government cannot have it both ways.  If Riddle's mention of Kevin Adell was probable cause for the December 11, 2007 wiretap, and the FBI knew but failed to disclose that they had made Riddle aware of the federal investigation, then by all means the FBI interview of Riddle, in the government's exclusive possession, is relevant, not only to Ms. Waters but to her effective challenge of the probable cause finding Judge Cohn made on December 11, 2007.  Government's Exhibits 3(B), 3(C), 3(D), 3(E), and 3(F) (Calls 18862, 18898, 18910, 18913, and 18918), all of which the government intercepted without ever having named Ms. Waters as an interceptee, were all derived from the December 11, 2007 order.  That the government can now claim the FBI Riddle interview regarding Kevin Adell is "not relevant" suggests that

the government may well be withholding evidence that would tend to negate the probable cause it claimed in support of the December 11, 2007 wiretap application.[16]

48. In his 9/13/2007 affidavit, SA Lubisco drew several conclusions that were not supported by the record evidence.  At Paragraph 11, SA Lubisco concluded that Call 6419 showed that Wendolyn Johnson confirmed for Riddle that the feds were looking at Kwame Kilpatrick.  The conversation centered on the ongoing civil trial in Wayne County involving two Detroit Police whistleblowers.  When Johnson stated that she was being sent over to observe the trial, Riddle stated there was nothing actionable by the feds.  Johnson stated "Of course there is."  Riddle stated, "I doubt it."  Riddle then predicted that the Mayor of Detroit would lose the civil case.  The call ended abruptly when Riddle received another call.  It was highly speculative of SA Lubisco to conclude that this exchange demonstrated that Johnson "confirmed" the federal Kilpatrick investigation.

49. In Paragraph 12 of his September 13, 2007 affidavit, SA Lubisco concluded that Call 6806, in which Johnson told Riddle that Christine Beatty is in law school, confirmed that there was an ongoing federal investigation of Beatty.  To the contrary, Riddle told Johnson that Beatty had personally told Riddle that Beatty was going to law school.  Riddle then volunteered that, by going to law school, Beatty was trying to become independent.  When Johnson expressed concern whether Beatty would pass a background check, Riddle stated that Beatty had no convictions.  Riddle then volunteered, "And the way y'all move, she could have a family, another family and

---

[16] An FBI 302 that could affect the veracity of a Title III affidavit and application would seem to fit squarely within the strictures of *Brady v. Maryland*, 373 U.S. 83 (1963).

everything before she got, before she had any issues." Call 6806 does not establish that Johnson disclosed Grand Jury information to Riddle.

50. In Paragraph 15 of his September 13, 2007 affidavit, SA Lubisco concluded that Call 7234 established that Johnson disclosed non-public details of a federal investigation and that Riddle was attempting to identify an undercover agent. Ten minutes into the call, Riddle mentioned Gaspar Fiore, and Johnson said Fiore was a crook. Riddle then mentioned Bobby Ferguson. Johnson and Riddle had nothing more than a passing mention of Fiore. Again, Call 7234 does not establish that Johnson disclosed Grand Jury information to Riddle.

51. In Paragraph 17 of his September 13, 2007 affidavit, SA Lubisco concluded that Riddle was attempting to learn non-public details of a federal investigation because, in Call 7365, Riddle asked Johnson about a housing discrimination settlement. The housing discrimination settlement involved a civil settlement that had been made public, and Johnson had no knowledge anyway. Call 7365 does not establish that Johnson disclosed Grand Jury information to Riddle.

52. The problem of staleness arose repeatedly, not simply in the first affidavit, but in most of the renewal affidavits as well. The following substantive, factual paragraphs were repeated verbatim in successive affidavits, becoming more and more stale each time SA Lubisco "recited" them to establish probable cause:

| Allegation | 8/13/07 | 9/13/07 | 10/13/07 | 11/10/07 | 12/11/07 |
|:----------:|:-------:|:-------:|:--------:|:--------:|:--------:|
| Call 3085 | 25 | 23 | 27 | 31 | 29 |
| Call 3086 | 26 | 24 | 28 | 32 | 30 |
| Call 3477 | 27 | 25 | 29 | 33 | 31 |
| Call 3626 | 28 | 26 | 30 | 34 | 32 |
| Call 4090 | 29 | 27 | 31 | 35 | 33 |
| Call 4108 | 30 | 28 | 32 | 36 | 34 |
| Call 4111 | 31 | 29 | 33 | 37 | 35 |

| | | | | | |
|---|---|---|---|---|---|
| Call 4115 | 32 | 30 | 34 | 38 | 36 |
| Call 4116 | 33 | 31 | 35 | 39 | 37 |
| Call 4117 | 34 | 32 | 36 | 40 | 38 |
| Call 4123 | 35 | 33 | 37 | 41 | 39 |
| 7/25/07 surveillance near Papas office | 36 | 34 | 38 | 42 | 40 |
| Call 4135 | 37 | 35 | 39 | 43 | 41 |
| 7/25/07 depos., Papas check | 38 | 36 | 40 | 44 | 42 |
| Call 4143 | 39 | 37 | 41 | 45 | 43 |
| Call 4150 | 40 | 38 | 42 | 46 | 44 |
| Call 4254 | 41 | 39 | 43 | 47 | 45 |
| Call 4259 | 42 | 40 | 44 | 48 | 46 |
| Call 4254 | 41 | 39 | 43 | 47 | 45 |
| Call 4259 | 42 | 40 | 44 | 48 | 46 |
| Call 841 | 43 | 41 | 45 | 49 | 48 |
| Call 2493 | 44 | 42 | 46 | 50 | 49 |
| Call 2808 | 45 | 43 | 47 | 51 | 50 |
| Call 3485 | 46 | 44 | 48 | 29, 52 | 27, 51 |
| Call 3874 | 47 | 45 | 49 | 53 | 52 |
| Call 6857 | | 13 | 13 | 13 | 12 |
| Call 6876 | | 14 | 14 | 14 | 13 |
| Call 7234 | | 15 | 15 | 15 | |
| Call 7187 | | 16 | 16 | 16 | 14 |
| Call 7365 | | 17 | 17 | 17 | |
| 8/30/07 Stephen Hill mtg | | 18 | 18 | 18 | 15 |
| Call 7450 | | 19 | 19 | 19 | 16 |
| Call 7454 | | 20 | 20 | 20 | 17 |
| Call 7457 | | 21 | 21 | 21 | 18 |
| Call 5377 | | 46 | 50 | 54 | 53 |
| Call 5383 | | 47 | 51 | 55 | 54 |
| Call 6197 | | 48 | 52 | 56 | 55 |
| Call 6491 | | 49 | 53 | 57 | 56 |
| Call 7219 | | 50 | 54 | 58 | 57 |
| Call 7222 | | 51 | 55 | 59 | 58 |
| Call 7258 | | 52 | 56 | 60 | 59 |
| Call 7259 | | 53 | 57 | 61 | 60 |
| Call 7274 | | 54 | 58 | 62 | 61 |
| Call 7288 | | 55 | 59 | 63 | 62 |
| Call 7936 | | 56 | 60 | 64 | 63 |
| Call 7947 | | 57 | 61 | 65 | 64 |
| Call 7953 | | 58 | 62 | 66 | 65 |
| Call 7960 | | 59 | 63 | 67 | 66 |
| Call 7961 | | 60 | 64 | 69 | 68 |
| Call 8139 | | 61 | 64 | 70 | 69 |
| Meridian bank info. | | 62 | 69 | 83 | 87 |

53. The government's repeated usage of Sherry Washington was a continuing attempt to augment and embellish isolated facts without disclosing the entire picture.  SA Lubisco did not mention Sherry Washington in his initial affidavit, but he cited Washington in his July 14, 2007 affidavit and every affidavit thereafter.  What SA Lubisco withheld from the Court, however, was that Riddle knew of the Sherry Washington investigation because *Sherry Washington called Riddle* and asked Riddle to assist her with the public relations fallout from being under federal investigation.  Call 2922 (7/11/2007).  In Call 2922, Riddle clearly knew of the Grand Jury investigation, from Washington herself, *before* Riddle called Johnson.[17]

54. With only a few minor word changes, SA Lubisco repeated Paragraph 11 of his July 13, 2007 affidavit almost verbatim in Paragraph 16 of his August 13, 2007 affidavit.  Yet SA Lubisco reported no additional information; in fact, the August 13, 2007 affidavit repeated that Riddle disclosed information about Sherry Washington to Johnson, and not vice versa.  Likewise, SA Lubisco assumed that, because the Detroit News reported that the School Board Risk Management report was not yet public, that somehow Riddle was obtaining Grand Jury information from Johnson.  Nowhere in his August 13, 2007 affidavit did SA Lubisco relate that Riddle was in fact obtaining his information directly from Sherry Washington.  Based on the Sherry

---

[17] Even then, Johnson remained silent and did not provide any information regarding Washington to Riddle in Call 2922.

23

Washington "information," there was no probable cause to continue the Section 1503 wiretap after the initial 30 day authorization.[18]

55. SA Lubisco, at Paragraph 54 of his August 13, 2007 affidavit, and without disclosing Riddle's ongoing relationship with Sherry Washington, concluded that Riddle's questions to Johnson regarding Sherry Washington were significant because they "were not prompted by a Source inquiry."  SA Lubisco then concluded, without any justification:

> In addition, JOHNSON was not in a position to provide information about Sherry Washington because JOHNSON had not been made privy to it.  However, the fact that RIDDLE asks JOHNSON questions about ongoing investigations is significant and demonstrates that he is likely to continue to do so.

SA Lubisco 8/13/2007 affidavit, Par. 54.

Probable cause to establish a violation of Title 18, United States Code, Section 1503 requires proof that Johnson and Riddle corruptly endeavored to influence or impede the Grand Jury investigation.  *United States v. Vesich*, 724 F.2d 451 (5th Cir. 1984); *United States v. Rosner*, 485 F.2d 1213 (2nd Cir. 1973); 18 U.S.C. § 1503.  Even under the cases relied upon by the government, *United States v. Forman*, 71 F.3d 1214, 1220 (6th Cir. 1995), and *United States v. Jeter,* 775 F.2d 670, 676 (6th Cir. 1985), intent to obstruct the due administration of justice is a required element of § 1503.  Based on the lack of evidence of an endeavor to disclose Grand Jury information, the wiretap should not have continued past the initial 30 days, during which the government had failed to establish probable cause of  a § 1503 violation.  *See* 18 U.S.C. § 2518(5).

---

[18] Defendant Waters does not concede that there was probable cause for the initial wiretap; *arguendo*, once the initial wiretap failed to yield evidence of obstruction of justice, no further wiretaps should have been permitted.  18 U.S.C. §§ 2518(4)(e); 2518(5).

56. In Paragraph 10 of his 9/13/2007 affidavit, SA Lubisco again repeated the same information regarding Sherry Washington and Call 2922 (7/11/2007) from his July 14, 2007 and August 13, 2007 affidavits. At Paragraph 13 of the September 13, 2007 affidavit, SA Lubisco reported that Sherry Washington called Riddle (Call 6857) and wanted to meet. At paragraphs 14 and 16 of the September 13, 2007 affidavit, SA Lubisco finally recognized that Calls 6876 and 7187 demonstrated that Sherry Washington wanted to retain Riddle for public relations as she underwent a Grand Jury investigation. In that event, Riddle was simply performing the duties of his job as a political consultant and media consultant. Neither paragraph established probable cause that Riddle was obstructing or conspiring to obstruct justice. The only remotely possible reference befitting of obstruction in the September 13, 2007 affidavit is Paragraph 19, in which Johnson calls Riddle (Call 7450) and tells Riddle she did not know Sherry Washington's sister was involved.

57. Johnson also told Riddle that Johnson relayed information, presumably she received from Riddle, to the agents and prosecutors on the Washington investigation, and that those agents did not know about the missing art until Johnson told them.[19] Rather than taking that as a cue to obstruct justice, Riddle instead discussed his knowledge of Sherry Washington that he obtained directly from Washington's e-mail to Riddle, and Riddle concluded by telling Johnson that Wayne County Prosecutor Kym Worthy needed to pursue charges against Sherry Washington immediately, and that Worthy

---

[19] SA Lubisco also curiously neglects to mention that Johnson stated that Sherry Washington would not work with the FBI because Washington did not trust them.

needed to work with the Feds on Sherry Washington.[20]  The September 13, 2007

affidavit, like its predecessors, failed to establish probable cause of obstruction of

justice.

58.  During Call 7450, Riddle specifically told Johnson that, during the taping of the

Mildred Gaddis show the previous Sunday, Bankole Thompson told Riddle that

Sherry Washington had stormed into the offices of the Michigan Chronicle and had

called Thompson "an African monkey."  SA Lubisco disclosed none of this

information to the Court, all of which established that Sherry Washington was a

public figure in the news, not someone over whom Riddle or Johnson endeavored to

obstruct justice.

59.  SA Lubisco's October 13, 2007 affidavit then simply repeated, verbatim, at

Paragraphs 12 through 16, and Paragraphs 19 through 21, the same rehashed

information about Sherry Washington that appeared in Lubisco's September 13, 2007

affidavit.  The only new paragraph regarding Washington was Paragraph 22, which

was literally the first new information in ten paragraphs.  Paragraph 22 addressed Call

9295, in which Johnson confirmed what Riddle already learned directly from Sherry

Washington, that there was financial investigation of Washington.  Inexplicably, SA

Lubisco in Paragraph 23 then addressed Call 9427, in which Riddle and Johnson

discuss Alonzo Bates sentencing, a matter of public record.  Johnson told Riddle that

every public official should review the transcript of Bates sentencing.  When Johnson

told Riddle that she might be pregnant, Riddle told Johnson that, if he got involved

---

[20] Again, it bears repeating that, if Johnson clearly violated Rule 6(e) and 18 U.S.C. § 1503 in Call 7450 to Riddle, it has been more than two and a half years and the government still has not charged Johnson or Riddle with obstruction of justice.

with Sherry Washington, Johnson's baby's daddy might end up in jail.  SA Lubisco

concluded that Riddle's statement indicates potential obstruction of justice, when in

fact Riddle was expressing relief that he had not accepted Washington's request to

retain Riddle.  The October 13, 2007 affidavit failed to establish probable cause of

obstruction of justice.  In fact, Call 9427 was so nonindicative of probable cause that

the FBI cut off, or "minimized," Call 9427 immediately after Riddle's "daddy in jail"

comment.  Thus, even though the wiretap was for obstruction of justice, it was

obvious to the agent recording the conversation that Call 9427 was not evidence of

obstruction.

60. As discussed above, SA Lubisco then claimed at Paragraph 24 in his October 13,

2007 affidavit that Riddle called an "unknown female" who was a well-known media

figure and political activist, in Call No. 9466.[21]  What Riddle told the known

"unknown female" was simply that the "feds" had subpoenaed records and that there

might be something reportedly publicly in the near future regarding Sherry

Washington.  Riddle did not discuss any inside information from Johnson; there was

thus no probable cause upon which to continue to seek a wiretap for obstruction.

61. In his November 11, 2007 affidavit SA Lubisco once again repeated all of the

previous Sherry Washington information, now several months old, in Paragraphs 12

through 24.  The November 11, 2007 affidavit contained no new information

regarding Washington whatsoever.  Once again, SA Lubisco failed to establish

probable cause to continue the wiretap for obstruction of justice.

62. In his December 11, 2007 affidavit, SA Lubisco again repeated all of the previous

Sherry Washington information, now even an additional month more stale, in

---

[21] Call 9466 is the call SA Lubisco repeatedly listed as September 22, 2008, a date that had not yet occurred.

Paragraphs 12 through 21.  Even SA Lubisco must have begun to realize how often he was repeating himself; SA Lubisco reduced the Sherry Washington "obstruction" information by three paragraphs.  Nonetheless, SA Lubisco continued to present insufficient probable cause for continuing the Section 1503 wiretap.

63. As further proof that SA Lubisco overrepresented the Sherry Washington situation, at the very time Calls 6806, 6857, 6876, 7234, 7187, and 7450 purportedly establish obstruction, SA Lubisco fails to even mention Calls 6863, 6865, 6892 (in which Johnson and Riddle discussed the Fieger indictment, and Johnson opined that the Fieger indictment would cause people to lose trust in DOJ), 6916, 7158, 7161, 7162, and 7174, each of which occurred between Riddle and Johnson and during each of which they did *not* discuss Sherry Washington.  Call 7187, which SA Lubisco cited in four affidavits, indicated only that Washington could not afford Riddle as a consultant.

64. In his October 13, 2007 affidavit (par. 25), November 11, 2007 affidavit (par. 25), and December 11, 2007 affidavit (par. 22), SA Lubisco claimed that Call 9993 demonstrated that Riddle was providing confidential information to his employer, Monica Conyers.  Call 9993, however, demonstrates that Conyers gave Riddle information about Sheila Cockrel and Alberta Tinsley-Talabi. In fact, the Detroit News had publicly reported on January 25, 2006 that Tinsley-Talabi had publicly acknowledged that she was under FBI investigation for having hired Alonzo Bates' daughter.  Further, on December 4, 2004, WJBK Fox News Reporter Scott Lewis had publicly reported that the FBI was investigating Alonzo Bates, and that after the FBI left Bates' office, they went to Sheila Cockrel's office.  As such, Lubisco's affidavits

failed to establish that Riddle was endeavoring to obstruct justice.  SA Lubisco's

conclusions regarding Call 9993 were speculative at best.

65. While the government has provided no explanation, there are several calls on October

17, 2007, that the FBI did not record.  At 10:38 a.m., Thomas LaBret, the uncharged

but purported Southfield briber, called Riddle.  At 10:45 a.m., Riddle called William

Lattimore, the purported bribee.  At 10:47 a.m., Riddle called LaBret.  At 10:49 a.m.

and at 11:32 a.m., Riddle called Defendant Mary Waters.  To date, the government

has provided no explanation why its round-the-clock, 7-month wiretap failed to

capture 5 telephone calls between the alleged bribe scheme participants.  These calls

are critical because they occur directly between the indicted overt acts in paragraphs

18 and 19 of the First Superseding Indictment, which identify Waters, Riddle, and

Lattimore.[22]

66. Likewise, in Call No. 10270, on October 5, 2007, Wendy Johnson asked Riddle to

help her, and Riddle suggested that Johnson call her police friend.  Riddle told

Johnson, in a call to her U.S. Attorney's Office phone, that he had a 1:00 meeting that

afternoon "with the guy that owns Zeidman's, a project I'm doing in Southfield."

Riddle told Johnson the location of his meeting at the Westin Hotel at 10 Mile Road

and Evergreen.  Although the government claims this meeting with Zeidman (Thomas

LaBret) was part of a conspiracy, the fact remains that Riddle openly talked about the

meeting and the Southfield project while talking on the phone with a USAO

---

[22] Since SA Lubisco authored more than 400 paragraphs (including reprised paragraphs in triplicate, quadruplicate, and quintuplicate) of purported probable cause and did not once mention William Lattimore, and since these October 17, 2007  telephone calls are unaccounted for in the more than 21,000 intercepted calls, and since these five calls occurred in the very heart of the charged conspiracy, it does not stretch credulity to question whether these telephone calls contained exculpatory information.   The government taped thousands of other impertinent calls, yet these calls in the midst of charged overt acts were apparently not recorded.  Ms. Waters can only ask why not, and the government thus far has provided no explanation.

employee; Riddle had nothing to hide.  Curiously, the government has not listed the tape of this call as a trial exhibit.  SA Lubisco never referred to this phone call in his Title III affidavits.  Yet in this conversation Riddle clearly stated to Johnson that Detroit radio personality Mildred Gaddis had someone at the FBI passing information to her.

67. As the months passed, and as the wiretap failed to yield evidence for which it was authorized under 18 U.S.C. § 1503, SA Lubisco continued to stretch inferences in order to try to establish probable cause to continue the interceptions.  In the November 10, 2007 affidavit, at Paragraphs 27 and 28, SA Lubisco relates information about Call 12606, a phone call Riddle made to Brian Berg on October 26, 2007.  The actual call involves Riddle speaking with Berg about an unrelated matter in Flint, and Berg volunteered to Riddle, several minutes into the call, that Louis [DeWeaver], along with a builder and a "couple of other" witnesses,  had testified against Berg in the Grand Jury regarding a casino.  Berg stated to Riddle that the Grand Jury could indict a bologna sandwich.  Riddle stated that perhaps he should "drop a dime" on "Louis" at the U.S. Attorney's Office.  When Riddle then placed Call 12607 to Wendolyn Johnson but did not even leave a message, SA Lubisco somehow concluded that Berg  Riddle was attempting to influence a pending Grand Jury.  These two paragraphs are the only paragraphs in Lubisco's entire November 10, 2007 affidavit that presented any new information regarding supposed obstruction of justice, and they amounted to a Grand Jury target volunteering information about himself, and Riddle dialing Wendy Johnson's phone number at the U.S. Attorney's Office.

68. What SA Lubisco failed to inform the Court, however, was that six minutes before the Brian Berg call, Riddle had spoken with Wendy Johnson in Call No. 12604 while Johnson was at the U.S. Attorney's Office.  Neither Johnson nor Riddle had mentioned Berg.  SA Lubisco further failed to mention that, immediately after not leaving a message for Wendy Johnson, Riddle called Berg back in Call No. 12608. Riddle and Berg spoke again about the Flint Mayor's press conference that Riddle could not reach his USAO contact, and that Louis was "off the deep end."  The next actual call between Riddle and Johnson was Call No. 12671, later that same afternoon.  Riddle told Johnson that he was in Flint, but Riddle did not even mention Brian Berg or Louis DeWeaver.  Call No. 12671 lasted six minutes.  Later that evening, Riddle and Johnson spoke for ten minutes on Call No. 12682, and again, neither mentioned Brian Berg or Louis DeWeaver.  Thus the November 10, 2007 affidavit failed to establish probable cause to continue the Section 1503 wiretap.

69. Between October 13, 2007, and November 10, 2007, according to the FBI synopsis, there were 151 calls between Riddle and Johnson.  Yet in his November 10, 2007 affidavit, SA Lubisco listed only one call between Riddle and Johnson (Call No. 12054 on 10/23/2007), and Lubisco did not establish that Johnson had access to "source information" regarding Gary Brown.

70. All but one of the Jim Papas calls occurred between June 27, 2007, and July 25, 2007. Yet SA Lubisco kept repeating the Papas information each month as if it were a continuing offense.  In the subsequent four months, SA Lubisco essentially provided no new information, and so there was no even remotely-fresh probable cause to continue seeking a wiretap.  18 U.S.C. § 2518(1)(d).

71. Under the terms of Judge Cohn's December 7, 2007 amended order, the Fifth
    Renewal Order expired on December 9, 2007.  In that the Sixth Renewal application
    was not submitted until December 11, 2007, it was not a renewal; it was an entirely
    new order.

72. As fruits of the poisonous tree, it is clear that without these illegal wiretaps, the
    government would not have had any evidence from which to derive evidence of the
    purported bribe(s) of Southfield City Councilman William Lattimore.  The
    government would have had no evidence to even open an investigation of Defendant
    Mary Waters, much less charge her.  Not only should the wiretap evidence be
    suppressed under 18 U.S.C. §§ 2515, 2518(10)(a)(i), 2518(10)(a)(iii); the entire First
    Superseding Indictment should be dismissed.


    WHEREFORE, premises considered, Defendant Mary Waters respectfully prays
this Honorable Court suppress the seven wiretaps in this case, and all recordings
made pursuant thereto.

                             Respectfully Submitted;

                             _____/s/_____
                             Richard G. Convertino
                             Convertino & Associates
                             801 West Ann Arbor Trail, Suite 233
                             Plymouth, MI  48170
                             (734) 927-9900 Facsimile (734) 927-9904
                             rgc@convertino.net


Dated:  May 12, 2010

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,
Plaintiff,

Case No. 09-20295-05
HON. MARIANNE O. BATTANI

v

MARY WATERS
Defendant.

_____/

Robert Cares                                          Richard G. Convertino
United States Attorney                                Attorney for Mary Waters
211 W. Fort Street, Ste. 2001                         801 West Ann Arbor Trail,
Detroit, MI 48226                                     Plymouth, Michigan  48170
313-226-9100                                          (734) 927-9900

_____

CERTIFICATE OF SERVICE

        I hereby certify that on May 12, 2010, I electronically filed the foregoing document with

the Clerk of the Court using the ECF system which will send notification of such filing to the

attorneys of record.

                        _____/s/_____
                        Richard G. Convertino
                        Convertino & Associates
                        801 West Ann Arbor Trail, Suite 233
                        Plymouth, MI  48170
                        (734) 927-9900 Facsimile (734) 927-9904
                        rgc@convertino.net

May 12, 2010